IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31259-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BONIFACIO ALCANTAR- | ) | UNPUBLISHED OPINION |
| MALDONADO, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — An angry Bonifacio Alcantar-Maldonado forcibly entered his

estranged wife's apartment and pummeled her boyfriend. A jury convicted Alcantar-

Maldonado of assault in the first degree and acquitted him of charges of assault in the

second degree and burglary in the first degree. We reject Alcantar-Maldonado's

contention that the one conviction lacked sufficient evidence. Because Alcantar-

Maldonado did not use his car to commit the crime, we vacate the trial court's direction

to the Department of Licensing to revoke Alcantar-Maldonado's driver's license.

FACTS

During marriage, Twylight Krusow and Bonifacio Alcantar-Maldonado

respectively bore and begat a child, J., in 2007. The couple separated in March 2010. In

anticipation of divorce, Alcantar-Maldonado moved from their Pasco residence to a

friend's house in Kennewick, but he continued to pay rent and utilities at the Pasco

residence where Krusow and their daughter resided.

During the pendency of their divorce, Bonifacio Alcantar-Maldonado participated in the care and control of their daughter J. After caring for J. on the evening of May 7, 2010, Alcantar-Maldonado drove J. to Twylight Krusow's Pasco residence. Around 10:00 that night, Eudis Mendoza joined Krusow at her residence. Krusow met Mendoza weeks before at a night club. That night, the two watched a movie together before retiring to the bedroom and falling asleep.

Late the night of May 7 or early the morning of May 8, Bonifacio Alcantar-Maldonado drove past Twylight Krusow's residence and saw an unfamiliar car parked outside. Out of concern for his daughter, he exited his car and pounded on Krusow's door. Krusow, with a safety chain securing the door, opened the door slightly. Alcantar-Maldonado demanded Krusow direct whoever was inside the house to leave because the house is his and his daughter is therein. Krusow replied, "whatever," and slammed the door in Alcantar-Maldonado's face. Report of Proceedings (RP) at 268. He told her to open the "'F'in door.'" RP at 89. Krusow refused.

Bonifacio Alcantar-Maldonado kicked the door open and marched directly to Twylight Krusow's bedroom where he saw Eudis Mendoza. As he walked down the hall, Krusow saw he had a gun in his hand. Krusow ran down the hall screaming, "he's got a gun, he's got a gun." RP at 25.

2

According to Bonifacio Alcantar-Maldonado, he approached and told Eudis Mendoza, "I don't know who you are[.] I don't care who you are[.] [T]his is my house and you need to leave now." RP at 268. Instead of leaving, Mendoza struck Alcantar-Maldonado above his knee. In response, Alcantar-Maldonado punched Mendoza twice in the face, drew his gun, grabbed him by the shirt, and pushed him out of the bedroom. Alcantar-Maldonado exchanged words with Krusow and, when he turned around, he, to his surprise, saw Mendoza sitting on the living room couch. Alcantar-Maldonado told Mendoza to leave. Mendoza stood and, according to Alcantar-Maldonado, "start[ed] going left to right, left to right." RP at 270. Fearing that Mendoza would charge him, Alcantar-Maldonado kicked him in the face and, with gun in hand, pushed him out the front door.

Eudis Mendoza and Twylight Krusow related a different story. According to Mendoza and Krusow, Bonifacio Alcantar-Maldonado entered Krusow's bedroom, put his gun to Mendoza's head, and said he would blow Mendoza's "fucking brains out" if he did not leave. RP at 26. Mendoza tried to leave when Alcantar-Maldonado hit him in the face with his gun, two or three times. Krusow tried to stop the attack by putting herself between Mendoza and Alcantar-Maldonado. Alcantar-Maldonado hit her with such force that she flew into the bed.

Also according to Eudis Mendoza and Twylight Krusow, Mendoza stumbled to the living room where he tried to get his phone, keys, and shoes. As he bent to get his

3

keys, Alcantar-Maldonado kicked him and again hit him in the face, causing his eye to swell so that he could not see. A dazed Mendoza went for the door. Before he could pass through the door, Alcantar-Maldonado pushed him into the door and through the doorway.

As Eudis Mendoza made his way to his car, Aide Rodriguez, Twylight Krusow's mother who lived next door, approached Krusow's side of the duplex and saw Bonifacio Alcantar-Maldonado screaming at a bleeding Mendoza. The amount of blood alarmed Rodriguez. She tried to call for help, but Alcantar-Maldonado told her "not to fucking call the police." RP at 114. Krusow urged Rodriguez to obey Alcantar-Maldonado because he had a gun. Rodriguez complied and went into Krusow's home to check on J., who was "crying hysterically." RP at 115.

Meanwhile, José Rodriguez, Twylight Krusow's stepfather, approached Krusow's residence to investigate the noise. At the same time, Eudis Mendoza fumbled to open his car, but could not because he grabbed the wrong keys. Growing impatient with Mendoza, Alcantar-Maldonado belted Mendoza again. From inside the home, Aide Rodriguez heard the blow and describes the sound as bone breaking. José, who saw it, said the wallop sounded like a watermelon upon being thrown to the ground.

José Rodriguez inserted himself between Eudis Mendoza and Bonifacio Alcantar-Maldonado. But Alcantar-Maldonado put his gun in José's face and told him to "[s]tay the fuck out of this." RP at 41. José retreated but continued to try to calm Alcantar-

4

Maldonado. Mendoza returned inside to retrieve his keys. Twylight Krusow and her mother handed him a towel, which he used to wipe blood from his face. Mendoza left the house and, with José between him and Alcantar-Maldonado, he entered his car and drove home. Minutes later Alcantar-Maldonado left in his car and Krusow called the police.

Police responded, took statements, collected evidence, and set up a perimeter around Twylight Krusow's home. Krusow provided officers with a description of Alcantar-Maldonado's car and his home address. Officers observed a vehicle matching the description speeding towards Kennewick, where Alcantar-Maldonado lived. Police could not catch the car. Police later found the vehicle in the driveway of the address Krusow provided.

Police obtained a warrant to search Bonifacio Alcantar-Maldonado's residence and executed the warrant the morning of May 8. Inside the residence, police found a gun, with blood thereon, under Alcantar-Maldonado's bed. A state forensic scientist, Lisa Turpen, tested four sites on the gun for blood, including red specks she found inside the barrel. Every site tested positive for blood. She compared the blood found on the gun with Eudis Mendoza's blood. Based on her analysis, Turpen concluded the chances the blood on the gun came from someone other than Mendoza was one in twenty-four quadrillion.

On the morning of May 8, Dr. Beverly Harn treated Eudis Mendoza. Dr. Harn testified Mendoza had multiple facial injuries, soft tissue swelling, bruises, lacerations on

5

the face, and a bruise on his shoulder. A computed tomography (CT) scan uncovered

additional injuries. When asked at trial to identify the additional injuries, Harn read from

a list:

> Initially, he had some lacerations that we had to suture. One on the bridge of his nose. One on the left cheek.
>
> He had bruising and swelling on his cheek. He had a bruise on his right shoulder. The CT-Scan delineated what was broken in his face, which you can't see without the CT-Scan.
>
> And he had orbital fractures on the eye socket. Injuries both on the outside wall and on the floor of the eye socket. Both of those were fractured in several places and displaced a little. He had a fracture in the lamina papyracea, which is the inside part of the back of the eye socket.
>
> His sinus in his cheek, his maxillary sinus, the outside wall and the front wall and the medial wall or the middle wall were all broken and displaced. One of the fractures extended down into the base of his teeth.
>
> His nose was broken on both sides, as well as the middle of the nose. He had swelling in the soft tissues and air in the soft tissues and swelling in the sinuses—both in the maxillary and sigmoid sinuses, which are on the face, back behind the sinus and back by the nose. And then, there was some swelling in the central sinus called the sigmoid sinus.

RP at 130-31. As a result of his injuries, Eudis Mendoza underwent surgery to insert two

plates in his head to fuse the bones together and a tube in his nose to stabilize the bones.

## PROCEDURE

A jury convicted Bonifacio Alcantar-Maldonado of first degree assault with a

deadly weapon enhancement. The trial court sentenced him to 180 months' confinement.

In addition, the court found Alcantar-Maldonado used a vehicle in the commission of his

crime. Pursuant to RCW 46.20.285, the court directed the Department of Licensing to

revoke his driver's license for a year.

## LAW AND ANALYSIS

*Sufficiency of Evidence*

Bonifacio Alcantar-Maldonado first contends insufficient evidence supports his conviction for first degree assault. He argues the State failed to establish that he intended to inflict "great bodily harm," or that he fired his firearm during the assault. Either failure, he contends, is sufficient to reverse his conviction. He also contends the State needed to prove he actually inflicted great bodily harm upon Eudis Mendoza and the State failed in its burden.

Alcantar-Maldonado misreads the evidence and the law. Sufficient evidence supports his conviction for first degree assault because any reasonable jury could conclude he intended to cause great bodily harm when he repeatedly struck Mendoza in the face with his hands, feet, and gun. Contrary to Alcantar-Maldonado's contention, the State need not prove he discharged his gun to prove first degree assault by the use of a gun.

Evidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113

7

Wn.2d 591, 781 P.2d 1308, 789 P.2d 306 (1989).

The jury found Bonifacio Alcantar-Maldonado guilty of first degree assault. RCW 9A.36.011 reads:

> (1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
>     (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or
>     . . . .
>     (c) Assaults another and inflicts great bodily harm.

"Great bodily harm" is statutorily defined as:

> (c) "Great bodily harm" means bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ.

RCW 9A.04.110(4).

Bonifacio Alcantar-Maldonado contends the State was required to prove Eudis Mendoza suffered actual injury. We believe the State proved great bodily harm, but do not rest our decision on this ground. The State charged Alcantar-Maldonado only with subsection (a) of first degree assault, assault with a firearm, and infliction of a distinct level of injury is not an element of this subsection. Both the State and Alcantar-Maldonado agreed the trial court should instruct the jury that, to convict the defendant of the crime of assault in the first degree, the State must prove beyond a reasonable doubt that "the defendant assaulted Eudis Mendoza; [t]hat the assault was committed with a firearm; [and that] the defendant acted with intent to inflict great bodily harm." Clerk's

8

Papers (CP) at 121. The court further instructed the jury that "it is not necessary that bodily injury be inflicted." CP at 47.

A reading of RCW 9A.36.011(c) of the statute confirms the jury instruction's reading of RCW 9A.36.011(a). Subsection (c) requires the assault actually "inflict[] great bodily harm." This language is missing from subsection (a). "[I]t is an 'elementary rule that where the Legislature uses certain statutory language in one instance, and different language in another, there is a [different] intent.'" *State v. Jackson*, 137 Wn.2d 712, 724, 976 P.2d 1229 (1999) (quoting *United Parcel Serv., Inc. v. Dep't of Revenue*, 102 Wn.2d 355, 362, 687 P.2d 186 (1984)). The legislature would have included similar language in subsection (a) if it intended the State to prove defendants charged with that provision actually inflicted great bodily harm.

Under subsection (a) of the statute, the State must prove Bonifacio Alcantar-Maldonado assaulted Eudis Mendoza with a firearm "with intent to inflict great bodily harm." RCW 9A.36.011(1). Alcantar-Maldonado argues the State failed in this burden also. In determining whether a defendant intended to inflict great bodily harm, a jury may consider the manner in which the defendant exerted the force and the nature of the victim's injuries to the extent that it reflects the amount or degree of force necessary to cause the injury. *State v. Pierre*, 108 Wn. App. 378, 385, 31 P.3d 1207 (2001); *State v. Huddleston*, 80 Wn. App. 916, 921-22, 912 P.2d 1068 (1996).

We find sufficient, if not overwhelming, circumstantial, if not direct, evidence to

establish an intent to cause great bodily harm. The manner in which Bonifacio Alcantar-Maldonado exerted force shows he intended to inflict great bodily harm. Alcantar-Maldonado told Mendoza he would blow his "fucking brains out," and then struck Mendoza in the face with his metal gun as many as three times, hit and kicked him in the face, and pushed him into a door and through a doorway. RP at 26. Aide Rodriguez testified that the noise of Alcantar-Maldonado striking Mendoza sounded like bones breaking. José Rodriguez likened the sound to a watermelon thrown to the ground. Mendoza bled so much, he scared Aide.

Bonifacio Alcantar-Maldonado contends the amount of blood has little or nothing to do with the severity of the injury. Alcantar-Maldonado is not a physician. And the weight accorded to evidence is the province of the jury. *State v. Rogers*, 44 Wn. App. 510, 517, 722 P.2d 1349 (1986). The jury could properly find Alcantar-Maldonado intended to inflict great bodily harm from the manner in which he carried out his melee.

The nature and extent of Mendoza's injuries also reflect Alcantar-Maldonado's intent to inflict great bodily harm. As a result of the attack, Mendoza's eye swelled, leaving him unable to see. His injuries were so numerous that Dr. Harn brought a list to court in order to remember them all. Included on that list were multiple fractures to his orbital bones, eye sockets, cheeks, and nose, one of which extended down into the base of his teeth. As a result of the fractures and swelling, Mendoza's sinuses and eye sockets

10

were displaced. To fuse the bones together, Mendoza had two plates surgically implanted in his face.

Bonifacio Alcantar-Maldonado contends Eudis Mendoza's injuries did not result in the kind of serious permanent disfigurement the statute contemplates. To support his contention he cites *State v. Hill*, 48 Wn. App. 344, 739 P.2d 707 (1987). In *Hill*, the court sustained a first degree assault conviction where the victim's scars could not be erased by plastic surgery. 48 Wn. App. at 347. Alcantar-Maldonado contends Mendoza's injuries are unlike the victim's in *Hill*. But Hill does not stand for the proposition that permanent scarring is necessary to show an intent to cause great bodily harm.

Finally, Bonifacio Alcantar-Maldonado contends no reasonable jury could find him guilty of first degree assault because he did not fire his firearm. He argues case law indicates that an individual must actually fire a gun in order to be guilty of first degree assault with a firearm under RCW 9A.36.011(1)(a). *See State v. Odom*, 83 Wn.2d 541, 520 P.2d 152 (1974); *State v. Flett*, 98 Wn. App. 799, 992 P.2d 1028 (2000); *State v. Mann*, 157 Wn. App. 428, 237 P.3d 966 (2010). His reliance is misplaced. As the State correctly argues, none of those cases held a defendant must fire a gun to establish intent to inflict great bodily harm. Rather, those courts hold that firing a gun is sufficient evidence of intent to cause great bodily harm.

*State v. Odom*, actually contradicts Bonifacio Alcantar-Maldonado's contention.

11

In *Odom*, our high court declared that the absence of a shot was not determinative. 83 Wn.2d at 551. Thus, despite not firing his gun, any reasonable jury, relying on the evidence described above, could still find Alcantar-Maldonado used a firearm to commit first degree assault. Alcantar-Maldonado used the gun as an instrument to strike many of his blows. Eudis Mendoza's blood was smeared on the gun.

## Revocation of Driver's License

Bonifacio Alcantar-Maldonado asks us, in the event we affirm his conviction, to reverse the trial court's revocation of his driver's license. In Washington, a court may instruct the Department of Licensing to revoke a defendant's license upon a conviction of one of many crimes, including "[a]ny felony in the commission of which a motor vehicle is used." RCW 46.20.285(4). Alcantar-Maldonado argues that he did not "use" his vehicle in the commission of his felony. The State argues his use of the vehicle to transport him to and from the scene of the crime is sufficient use to revoke his license.

RCW 46.20.285(4) does not define "use." In order for RCW 46.20.285(4) to apply the vehicle must contribute in some way to the accomplishment of the crime. *State v. Batten*, 140 Wn.2d 362, 365, 997 P.2d 350 (2000). There must be some relationship between the vehicle and the commission or accomplishment of the crime. *Batten*, 140 Wn.2d at 365. "Used" in the statute means "'employed in accomplishing something.'" *State v. Hearn*, 131 Wn. App. 601, 609-10, 128 P.3d 139 (2006) (internal quotation marks omitted) (quoting *State v. Batten*, 95 Wn. App. 127, 129, 974 P.2d 879 (1999)

12

aff'd, 140 Wn.2d 362). RCW 46.20.285(4) does not apply when the vehicle was incidental to the commission of the crime. *State v. Wayne*, 134 Wn. App. 873, 875-76, 142 P.3d 1125 (2006).

In *Batten*, the defendant was convicted of unlawful possession of a firearm and possession of a controlled substance. Because James Batten used his car to conceal the firearm and to transport the controlled substance, the state high court held he "used" his car in the commission of a felony. In *State v. Dupuis*, 168 Wn. App. 672, 278 P.3d 683 (2012), we held the defendant "used" a car while committing the offense of second degree taking or riding in a motor vehicle without the owner's permission.

The Court of Appeals found a sufficient connection between the car and the crime when the defendant was given cocaine in exchange for a ride in his car. *State v. Griffin*, 126 Wn. App. 700, 708, 109 P.3d 870 (2005). This court also found the use of a vehicle was supported in *State v. Dykstra*, 127 Wn. App. 1, 110 P.3d 758 (2005), when the defendant and his accomplices to an auto theft ring drove around looking for cars to steal, drove stolen cars, posted someone in a lookout car during a theft, and drove away unwanted engine parts after disassembly. In *Hearn*, we rejected a sufficient connection between the crime of possession of methamphetamine and use of the car, when the drug was found in the defendant's purse and in clothing within a basket in the car. Tami Jo Hearn did not use the structure of the car to conceal the drugs. *Hearn*, 131 Wn. App. at 609-10. In *Wayne*, 134 Wn. App. at 875-76, this court ruled the statute did not apply

13

when the contraband item was found on the defendant's person because there was no reasonable relationship between the crime of possession and the vehicle, and the vehicle itself did not contribute in some reasonable degree to the commission of the felony.

Bonifacio Alcantar-Maldonado's use of his car facilitated, in a loose sense, his assault upon Eudis Mendoza, because the car transported Alcantar-Maldonado to the locus of the assault. Nevertheless, use of the car could be characterized as fortuitous or gratuitous in that Alcantar-Maldonado could have rode a bike or bus to his estranged wife's home. The commission of the felony did not entail operation of a motor vehicle.

No Washington decision answers the question of whether RCW 46.20.285(4) applies when the defendant transports himself to and from the scene of an assault. We believe Washington decisions, however, require a more direct connection between the use of the vehicle and the crime. We find support in this position in several foreign decisions.

Like Washington's law, an Ohio statute authorized a court to suspend a driver's license for a "felony in the commission of which a motor vehicle is used." Former OHIO REV. CODE. ANN. § 4507.16(A)(2) (West 1993). An Ohio appellate court held the statute was "reserved to those situations in which the motor vehicle is used either as a weapon or to transport contraband, or is the subject of the crime charged." *State v. Krug*, 89 Ohio App. 3d 595, 596, 626 N.E.2d 984 (1993). Accordingly, the court reversed the license suspension of a defendant who drove to a convenience store to retrieve his wife, grabbed

14

her by the hair, threw her into his automobile where he struck her several times, and drove her home where he continued the battery. The court reasoned that merely using an automobile as a means of transportation to or from a crime scene is insufficient.

Florida also permits courts to suspend a driver's license for felonies involving the use of a motor vehicle. FLA. STAT. § 322.26(3) (West 2006). A Florida court held that the statute does not permit revocation where the defendant only used the vehicle to drive to the scene of the crime. *Watson v. State*, 556 So.2d 489 (1990). The court held the statute required something more, for example, if the crime took place inside or from the vehicle.

Bonifacio Alcantar-Maldonado did not use his car to assault Eudis Mendoza. He did not use the car to transport contraband. His car was not the subject of the crime charged, and the crime did not take place inside or from his car. Accordingly, we vacate the portion of the sentence directing the Department of Licensing to revoke Alcantar-Maldonado's driver's license.

### Statement of Additional Grounds

A criminal appellant is entitled to assert arguments in addition to the assignment of errors forwarded by his or her counsel. Bonifacio Alcantar-Maldonado exercises this right and assigns numerous errors, all of which we reject.

Bonifacio Alcantar-Maldonado alleges "police negligence and incompetent investigation of the crime." Nevertheless, he directs the tenor of his argument toward a

15

different direction by contending eyewitnesses contradicted each others' testimony about the number of times he hit Eudis Mendoza in the face, when he kicked Mendoza, and with what hand he held the gun. He complains that the jury failed to grasp the significance of the irregularities in the testimony.

Assuming without deciding inconsistencies exist, Bonifacio Alcantar-Maldonado questions the jury's determinations of witness credibility and the weight to afford such testimony. But questions of credibility, persuasiveness, and conflicting testimony must be left to the jury. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011); *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992). The weight accorded to such evidence is also the sole province of the jury. *Rogers*, 44 Wn. App. at 517.

Bonifacio Alcantar-Maldonado contends Eudis Mendoza changed his story at trial to assert he had been hit seven times. As proof, Alcantar-Maldonado emphasizes the photograph of Mendoza's injuries and testimony from Dr. Harn. He insists that the photo only shows three visible injuries to Mendoza's face and that Dr. Harn testified she could not distinguish injuries caused by a gun. He argues the prosecutor corruptly permitted this inconsistent testimony. Alcantar-Maldonado claims that Mendoza lied, and the prosecutor knew Mendoza lied, but allowed the testimony anyways.

All of these contentions require this court to find Eudis Mendoza lied. As already written, questions of credibility and conflicting testimony are left to the jury. *Martinez*,

16

171 Wn.2d at 364; *Walton*, 64 Wn. App. at 415-16. Anyway, Bonifacio Alcantar-Maldonado fails to show Mendoza lied. He uses a photograph of Eudis Mendoza's injuries to prove Mendoza lied, but the photo is not in the record. Even if we could review the photograph, our seeing only three visible injuries would not prove Mendoza lied. The injuries would be consistent with Dr. Harn's testimony that the CT-Scan delineated injuries inside the face that could not be seen from the outside. In addition, Alcantar-Maldonado fails to identify any statement Mendoza previously made that was inconsistent with his trial testimony. Inconsistent testimony does not even prove a lie. Without proving Mendoza lied, he cannot prove the prosecutor knew about the lie and permitted it.

Bonifacio Alcantar-Maldonado additionally asserts that the State improperly commented on the evidence when, during closing, the State stated he hit Eudis Mendoza with the front of his gun. He contends the State's comment was false because no expert witness testified the blood on the barrel of the gun came from him hitting Mendoza. Alcantar-Maldonado argues the blood dripped down the barrel when he pushed Mendoza out of the bedroom and out of the house. In response, we note that witnesses testified that he hit Mendoza with his gun and Lisa Turpen, the state forensic scientist, testified she found blood inside the barrel of the gun. The blood belonged to Mendoza. Thus, the evidence supported the prosecutor's comment.

Bonifacio Alcantar-Maldonado contends the State lost Eudis Mendoza's written

statement, from which Alcantar-Maldonado argues the State committed misconduct. Nothing in the record confirms that Mendoza's written statement was lost.

Bonifacio Alcantar-Maldonado contends Twylight Krusow and Eudis Mendoza lied under oath when testifying that he hit Krusow so hard that he sent her flying across the room. Again, Alcantar-Maldonado questions the jury's determinations of witness credibility and the weight to afford such testimony. "Questions of credibility . . . and conflicting testimony must be left to the jury." *Martinez*, 171 Wn.2d at 364.

Bonifacio Alcantar-Maldonado contends his counsel provided ineffective assistance in two respects. First, he contends his counsel did not take a picture of a bruise that was on his leg, which would have substantiated his claim that Mendoza hit him above the knee. Second, he contends that his counsel's closing argument was "horrible" because he forgot to remind the jury of the inconsistencies in the State's testimony and the physical evidence supporting his innocence.

To establish ineffective assistance of counsel a defendant must satisfy a two-part test: (1) his counsel's assistance was objectively unreasonable and (2) as a result of counsel's deficient assistance, he or she suffered prejudice. *Strickland v. Washington*, 466 U.S. 688, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This court presumes counsel was effective. *State v. Gomez Cervantes*, 169 Wn. App. 428, 434, 282 P.3d 98 (2012).

18

Bonifacio Alcantar-Maldonado's argument fails to overcome the presumption of adequate representation. He contends his counsel failed to take a picture of a bruise on his leg. The bruise, Alcantar-Maldonado contends, would establish he lawfully defended himself from Mendoza. Nothing in the record supports Alcantar-Maldonado's contention that his counsel saw such a bruise or knew of the bruise. Alcantar-Maldonado asserts he has a report from a private investigator who asked his counsel if he saw the bruise, and that his counsel said yes. This report is not in the record. If Alcantar-Maldonado wished to expand the record, he should have moved to expand the record.

Assuming counsel knew of the bruise and his performance was deficient, neither the record nor Bonifacio Alcantar-Maldonado's assertions establish prejudice. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Alcantar-Maldonado "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

To make a determination of prejudice, this court considers the totality of the evidence before the jury. *Strickland*, 466 U.S. at 695. The State presented the jury with two eyewitnesses who testified that Mendoza did not strike Alcantar-Maldonado. Given

19

the variety of circumstances that could have caused the bruise on Alcantar-Maldonado's leg, it is unlikely a picture of the bruise would sway the jury.

Bonifacio Alcantar-Maldonado's own testimony negates his self-defense claim. To invoke self-defense, a defendant may not use more force than is necessary or more force than is reasonably prudent. *State v. Dunning*, 8 Wn. App. 340, 342, 506 P.2d 321 (1973). He testified that in response to Eudis Mendoza hitting him in the leg he punched Mendoza twice in the face, drew his gun, grabbed him by the shirt, and pushed him out of the bedroom. Alcantar-Maldonado's continued assault on Mendoza was not reasonable. Alcantar-Maldonado fails to overcome the presumption that counsel was effective.

Last, Bonifacio Alcantar-Maldonado contends insufficient evidence supports his conviction. We already answered this contention.

## CONCLUSION

We affirm Bonifacio Alcantar-Maldonado's conviction for first degree assault. We remand for resentencing with directions to vacate the revocation of Alcantar-Maldonado's driver's license from the sentence.

No. 31259-3-III
*State v. Alcantar-Maldonado*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____    _____
Korsmo, J.                                 Lawrence-Berrey, J.

21