

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72911-0-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JOSE JAIME ROSALES-CONTRERAS, | ) | |
| Appellant. | ) | FILED: April 18, 2016 |

APPELWICK, J. — Rosales-Contreras appeals his conviction for first degree assault. He argues that the State failed to prove that he intended to inflict great bodily harm. In a statement of additional grounds, Rosales-Contreras contends that he received ineffective assistance of counsel and asserts that the trial court abused its discretion by denying his challenge to remove a juror for cause. We affirm.

## FACTS

Jose Rosales-Contreras and Maria Dimas were married in 2003. Shortly after they were married, the two began arguing frequently. They argued most often about finances and disciplining the children.

Dimas had two sons from a previous relationship, Emilio and Jacob. And, Rosales-Contreras and Dimas had two sons together, Andrew and Giovanni.

Rosales-Contreras treated Emilio and Jacob differently than Andrew and Giovanni. Emilio and Jacob both had long lists of chores that they were expected to complete before Rosales-Contreras came home each night.

On April 2, 2008, Rosales-Contreras came home to find that thirteen year old Emilio had not finished his chores. He was furious, yelling at Emilio in the kitchen. He was just inches away from Emilio. From the bedroom Dimas heard Rosales-Contreras yelling, and she went into the kitchen to protect her son. She inserted herself in between Rosales-Contreras and Emilio. Rosales-Contreras told Dimas to move, but she refused, telling him, " 'I'm not moving. You're not going to hit my son.' " Rosales-Contreras again told Dimas, " 'Move or I'm going to hit you.' " Dimas stood her ground, and told Rosales-Contreras, " 'You're not going to hurt my son. You're not going to touch my son.' "

Dimas then saw Rosales-Contreras lift up his arm, and his fist came at her. Dimas saw a flash of bright light. She felt something dripping from her eye. Dimas was in unbearable pain, and she was afraid.

The next thing Dimas remembered, she was in the bathroom. She could tell that her eye was bleeding, and she could not open up her eyelid because it hurt too much. After lying in bed in pain for several hours, Dimas realized she had to see a doctor about her eye. She asked Rosales-Contreras to take her to the hospital, but he was too afraid that he would be arrested. So, Dimas drove herself to the urgent care that was 10 minutes away from her home.

Dimas had surgery, but she ultimately lost her vision in that eye. Her eye had shrunk, and she had to have a plastic sphere implanted to maintain the shape of her eye.

Dimas did not immediately report what Rosales-Contreras had done to her. Rosales-Contreras left the family and went to Mexico in December 2008. Once she knew that Rosales-Contreras was not coming back, Dimas filed for dissolution and sought a protection order against him. In March 2009, she went to the Federal Way Police Department to reveal what Rosales-Contreras had done to her.

Rosales-Contreras was first charged with assault in the second degree – domestic violence on March 24, 2009. But, he did not appear at arraignment. The State amended the information on February 3, 2011 to charge Rosales-Contreras with assault in the first degree – domestic violence, with an aggravating factor for committing the crime within the sight or sound of a minor child. Rosales-Contreras was apprehended in January 2014.

The case proceeded to trial, and the jury convicted Rosales-Contreras as charged. He appeals.

## DISCUSSION

Rosales-Contreras argues that the sufficiency of the evidence does not support his conviction, because the State did not prove that he intended to inflict great bodily harm. In a statement of additional grounds, Rosales-Contreras asserts that he received ineffective assistance of counsel, because his trial attorney did not present an involuntary intoxication defense, request a lesser included offense instruction, argue that ER 404(b) evidence should be excluded,

3

or obtain evidence to support his theory of the case. And, he argues that the trial court abused its discretion by denying his challenge to remove a juror for cause.

I.   Intent to Inflict Great Bodily Harm

Rosales-Contreras argues that the State did not prove beyond a reasonable doubt that he acted with specific intent to inflict great bodily harm on Dimas. He contends that because he struck Dimas only a single time with his fist, and her severe injury was unexpected, the evidence was insufficient to support his conviction.

When faced with a challenge to the sufficiency of the evidence, this court asks whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Sweany, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). In doing so, we view the evidence in the light most favorable to the State. Id. All reasonable inferences are drawn in favor of the State and interpreted most strongly against the defendant. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Credibility determinations are for the trier of fact, and we do not review them on appeal. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

A person commits assault in the first degree when he or she "with intent to inflict great bodily harm . . . assaults another and inflicts great bodily harm." RCW 9A.36.011. Great bodily harm is defined as "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." RCW 9A.04.110. The fact of great bodily harm standing

4

alone is not sufficient to prove assault in the first degree. See State v. Wilson, 125 Wn.2d 212, 218, 883 P.2d 320 (1994) (noting that assault in the first degree requires a specific intent to inflict great bodily harm). The State must also prove intent, which is established when a person acts with the objective or purpose to accomplish a result which constitutes a crime. RCW 9A.36.011; RCW 9A.08.010.

Generally, intent to commit a crime may be inferred when the defendant's conduct and the surrounding circumstances indicate such an intent as a matter of logical probability. State v. Vasquez, 178 Wn.2d 1, 8, 309 P.3d 318 (2013). The same is true with the intent to inflict great bodily harm—all of the details of the case may indicate intent, including the manner and act of inflicting the wound, and also the nature of the relationship and any prior threats. State v. Ferreira, 69 Wn. App. 465, 468-69, 850 P.2d 541 (1993).

Rosales-Contreras argues that the evidence here did not establish intent, because he struck Dimas only once. He points to two Washington cases where the evidence indicated intent to inflict great bodily harm. See State v. Pierre, 108 Wn. App. 378, 385-86, 31 P.3d 1207 (2001) (defendant was part of a group that kicked and stomped on the victim's head relentlessly, causing permanent brain damage); State v. Alcantar-Maldonado, 184 Wn. App. 215, 220, 340 P.3d 859 (2014) (defendant hit the victim in the face with a gun, pushed him into a door, kicked him, and struck him in the face). Rosales-Contreras suggests that these cases—and cases from other jurisdictions—demonstrate that when a defendant did not use a weapon to effect the assault, intent was established by repeated blows against an unresisting victim. The inference from the argument is that a

5

single blow is necessarily insufficient proof of intent to inflict great bodily harm. We disagree.

Neither Alcantar-Maldanado nor Pierre announced a bright line rule requiring the defendant to strike multiple blows. Instead, the court in both cases analyzed the specific facts of the case to conclude that there was sufficient evidence of intent. Alcantar-Maldonado, 184 Wn. App. at 225-26; Pierre, 108 Wn. App. at 385-86. And, most of the out-of-state cases that Rosales-Contreras cites involved crimes requiring a different specific intent than the one here: either malice or intent to kill. See, e.g., People v. Spring, 153 Cal. App. 3d 1199, 1204, 200 Cal. Rptr. 849 (1984) (malice); McAndrews v. People, 71 Colo. 542, 548-49, 208 P. 486 (1922) (malice); People v. Mighell, 254 Ill. 53, 59, 98 N.E. 236 (1912) (intent to kill); Nunn v. State, 601 N.E.2d 334, 339 (1992) (intent to kill); State v. Lang, 309 N.C. 512, 524-25, 308 S.E.2d 317 (1983) (malice); Commonwealth v. Thomas, 527 Pa. 511, 513, 594 A.2d 300 (1991) (malice). Thus, they offer little guidance as to what evidence is sufficient to prove intent to inflict great bodily harm. The remaining cases he relies upon recognize that whether intent to inflict great bodily harm is established depends on the facts of each case. See, e.g., State v. Gardner, 522 S.W.2d 323, 324 (Mo. Ct. App. 1975) (looking at the facts of the case); Flournoy v. State, 124 Tex. Crim. 395, 396, 63 S.W.2d 558 (1933) (looking at the facts of the case). Instead of supporting an argument that a single blow is insufficient to show intent, these cases demonstrate that intent is a fact specific inquiry.

And, the facts of this case allow a jury to conclude that Rosales-Contreras possessed the requisite intent when he struck Dimas. Jacob, who witnessed the

6

altercation, testified that he saw Rosales-Contreras raise his right hand and strike Dimas in the head. In the moments leading up to the punch, Rosales-Contreras was furious. He was yelling, his face was tensed up, his eyebrows were furrowed, and his arms were crossed. He told Dimas to get out of the way when she stepped between him and Emilio. When Dimas refused to move, Rosales-Contreras again told her to get out of the way. He specifically threatened her, " 'Move or I'm going to hit you.' " When Dimas stood her ground, Rosales-Contreras followed through with this threat, punching her in the eye. The blow was intentional.

The force required to inflict the injury Dimas suffered is indicative of the magnitude of harm Rosales-Contreras intended. All Dimas can remember of the punch was seeing a bright flash of light, feeling something dripping from her eye, and being in unbearable pain. She has a gap in her memory between the time of the punch and looking at herself in the bathroom mirror—she cannot recall how she got from the kitchen to the bathroom. Dimas eventually lost her vision in that eye. Dr. Daniel Selove, an expert witness in forensic pathology, testified that moderate to severe force was required to inflict Dimas's injury. In differentiating between moderate and severe force, he explained that moderate force would not cause loss of consciousness, whereas severe force would be akin to a "knock-out punch." The fact that Dimas had no memory of what happened between the flash of light and standing in the bathroom suggests that she momentarily lost consciousness. Viewing this evidence in the light most favorable to the State, a rational trier of fact could have found that Rosales-Contreras intended to inflict great bodily harm on Dimas.

7

We hold that sufficient evidence supports Rosales-Contreras's conviction for first degree assault.

## II. Ineffective Assistance of Counsel

In a statement of additional grounds, Rosales-Contreras argues that his trial attorney provided ineffective assistance on multiple occasions. He claims that his attorney failed to obtain phone and Facebook (social media website) records that would support his theory that Dimas fabricated this assault to get revenge on Rosales-Contreras for having a new girlfriend. And, he claims that his attorney failed to have ER 404(b) evidence pertaining to an incident on December 6, 2006 excluded. Rosales-Contreras further asserts that his attorney refused to argue an involuntary intoxication defense. And, he argues that his attorney failed to seek a lesser included offense instruction.

To demonstrate ineffective assistance of counsel, a defendant must first show that counsel's representation was deficient, in that it fell below an objective standard of reasonableness. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We presume that counsel's representation was effective. State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). The defendant has the burden to show deficient representation based on the record. McFarland, 127 Wn.2d at 335. A defendant must also show that counsel's deficient performance prejudiced the defendant, in that there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors. Id. at 334-35.

When counsel's actions can be characterized as legitimate trial strategy or tactics, performance is not deficient. State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). Whether to present a certain defense or request a lesser included offense instruction are tactical decisions made by counsel. See State v. Grier, 171 Wn.2d 17, 39, 246 P.3d 1260 (2011); In re Pers. Restraint of Woods, 154 Wn.2d 400, 420-21, 114 P.3d 607 (2005). Therefore, whether to present the involuntary intoxication defense or request a lesser included instruction were both tactical decisions. There is no evidence in the record that Rosales-Contreras went to the dentist and received sedatives on the day of the assault, as he claims would support an involuntary intoxication defense. Nor are there any facts surrounding Rosales-Contreras's conversations with his attorney to suggest that she refused to follow his wishes in defending the case or requesting a lesser included offense instruction. Without this evidence in the record, Rosales-Contreras has failed to meet his burden of showing deficient representation.

Rosales-Contreras also argues that his trial attorney's performance was deficient because she failed to have ER 404(b) evidence relating to an incident on December 6, 2006 excluded. The only ER 404(b) evidence that the trial court allowed was an incident during the spring of 2006. The trial court specifically excluded ER 404(b) evidence about the December 6, 2006 incident. Therefore, Rosales-Contreras has failed to show that his attorney's performance was deficient in this regard. We conclude that Rosales-Contreras did not receive ineffective assistance of counsel on these bases.

Lastly, Rosales-Contreras asserts that his trial attorney should have obtained evidence of Dimas's phone records and Facebook communications to support his theory of the case. He argues that this evidence would have shown that Dimas fabricated the assault because he refused to leave his girlfriend and reconcile with Dimas. Rosales-Contreras contends that his attorney should have sent a subpoena duces tecum to the phone company and Facebook instead of Dimas herself. He also notes that the subpoena duces tecum counsel did send failed to inform Dimas of her right to object.

Rosales-Contreras's trial counsel asked the State to assist in obtaining Dimas's phone records. The State agreed, but its efforts were ultimately unsuccessful. Consequently, Rosales-Contreras's attorney served a subpoena duces tecum on Dimas on August 25, 2014. It instructed Dimas to produce all Facebook or other recorded communications with Rubi Cardenas[1] and all copies of her phone records between April 2, 2008 and December 31, 2009. Dimas did not comply. Then, Rosales-Contreras's attorney moved to dismiss the case pursuant to CrR 8.3, arguing that the State committed misconduct by failing to obtain Dimas's phone records. The trial court denied this motion, because defense counsel should have known some time earlier that she needed to obtain the records herself. And, the court recognized that the subpoena duces tecum did not comply with court rules, because it failed to inform Dimas of her rights.

Trial counsel has a duty to investigate the case. State v. Jones, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). Rosales-Contreras's attorney did not investigate

---

[1] Cardenas was Rosales-Contreras's new girlfriend.

the phone and Facebook records when it became clear that the State could not obtain them, even though the State suggested several other avenues counsel could pursue. She also failed to follow court rules by not notifying Dimas of her right to object to the subpoena duces tecum. See CR 45. Because the subpoena duces tecum did not advise Dimas that she could object, the court refused to enforce it. Thus, these errors likely constituted deficient performance.

However, Rosales-Contreras has not shown that his attorney's deficient performance was prejudicial. The record does not contain the phone and Facebook records in question. Without knowing what, if anything, these records would have established, it is impossible to conclude that the records would have changed the outcome of the case.

Additionally, Rosales-Contreras's attorney was still able to present this theory of the case. Dimas testified that she found out that Rosales-Contreras had a new girlfriend in February 2009. She said that she spoke to this woman on the phone when she called Rosales-Contreras about the divorce papers. During her closing argument, defense counsel relied heavily on this event, stating,

> [T]he seminal event that really triggered [Dimas reporting the assault] was when [Rosales-Contreras's] girlfriend picked up the phone when she called down to Mexico about the divorce. Before then they had left -- [Rosales-Contreras] and her had separated for long periods of time, for months at a time, and he would always come back. This time, though, she found out that he had a new girlfriend. That was the seminal event that got her to march down to that police station and report that a crime had been committed.

And, counsel supported this theory by attacking Dimas's credibility, arguing that Dimas said whatever she needed to say to make Rosales-Contreras seem like a

11

monster. She confronted Dimas with her previous statements to the police and the defense, in which she did not include the same details about which she testified. And, she attempted to show that Jacob and Emilio were biased witnesses, whose stories had changed because they were trying to help their mother.

Dimas, however, explained that when she discovered that Rosales-Contreras had a new girlfriend, she was relieved, not jealous. She felt safer knowing that her family would no longer be Rosales-Contreras's focus. She testified that she decided to report the assault in March 2009, because she wanted to begin moving on with her life and start healing. Thus, the jury heard both sides of this argument. And, the jury found Rosales-Contreras guilty, indicating that it believed Dimas.

Therefore, while counsel likely erred by failing to investigate potentially relevant evidence, this error was not prejudicial. We hold that she did not provide ineffective assistance of counsel.

III.    Challenge for Cause

In his statement of additional grounds, Rosales-Contreras also asserts that the trial court erred by denying his challenge to remove juror 45 for cause.

During voir dire, juror 45 indicated that he would lean toward believing that Rosales-Contreras was guilty due to the violence involved, but he would wait until all the facts were presented to make a decision. Rosales-Contreras then asked that juror 45 be removed for cause. The court reminded the juror that Rosales-Contreras was not guilty at that point and would remain not guilty until the State

proved beyond a reasonable doubt that he is guilty. The court asked if the juror could accept this instruction, and the juror replied, "Yes." And, the court asked, "Can you be fair and impartial, wait for the end of the case before you make a decision in that regard?" Juror 45 replied, "Absolutely." As a result, the trial court denied Rosales-Contreras's request to remove the juror for cause. Rosales-Contreras later used a peremptory challenge to excuse juror 45.

This court reviews a trial court's denial of a challenge for cause for manifest abuse of discretion. State v. Noltie, 116 Wn.2d 831, 838, 809 P.2d 190 (1991). A juror's equivocal answers alone do not require the juror to be removed when challenged for cause. Id. at 839. Instead, the relevant question is whether a juror with preconceived ideas can set them aside. Id. The trial court is in the best position to observe a juror's demeanor and determine their ability to be fair and impartial. Id.

Here, while juror 45 at first expressed that he would have difficulty presuming that Rosales-Contreras was innocent, he later stated that he would absolutely be fair and impartial. Because the trial court was in the best position to judge whether juror 45 could be impartial, we defer to the trial court's judgment on this issue. Moreover, Rosales-Contreras exercised a peremptory challenge to remove this juror, which cured any error. See State v. Latham, 100 Wn.2d 59, 64, 667 P.2d 56 (1983) (noting that use of a peremptory challenge to remove a juror who should have been removed for cause cures the error). Rosales-Contreras has not demonstrated prejudice through the forced use of a peremptory challenge. See id. (where the juror is excused through a peremptory challenge, the defendant

13

must show the use of the peremptory challenge was prejudicial). We hold that the trial court did not err in denying the request to remove juror 45 for cause.

We affirm.

WE CONCUR: