# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73306-1-I |
| | ) | (consolidated with |
| Respondent, | ) | No. 73307-9-I) |
| | ) | |
| v. | ) | |
| | ) | |
| NICOLE A. SAND and | ) | |
| CANDY MATTILA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellants. | ) | FILED: August 1, 2016 |
| | ) | |

VERELLEN, C.J. — To show that a prosecutor's comments during rebuttal closing argument were prejudicial, a defendant must show a substantial likelihood that the comments affected the jury's verdict. In view of the strong evidence connecting Nicole Sand and Candy Mattila with the burglary of another's home, they fail to establish a substantial likelihood that the prosecutor's comments about Mattila's written statement affected the jury verdict.

Substantial evidence supports the trial court's finding that Sand and Mattila used a motor vehicle in committing the felony.

We find no abuse of discretion in the trial court's denial of Mattila's motion for a mistrial with regard to the typographical error in Amanda Rockwell's plea agreement.

As the State concedes, the trial court erred in sentencing Mattila, a first-time offender, and remand for resentencing is required.

Accordingly, we affirm Sand's and Mattila's convictions, vacate Mattila's sentence, and remand for Mattila's resentencing. We do not award costs on appeal.

FACTS

At about 12:40 a.m. on December 29, 2013, Howard Gorlick drove up the driveway of his home in Monroe and saw a truck he did not recognize parked in the driveway. Gorlick lived alone and had not given anybody permission to be at his house.

Gorlick's driveway is accessed through the back of a church parking lot and is several hundred feet long. The driveway is narrow and not lit and, for about the first 100 feet, the land on both sides of the driveway drops off about six feet. The driveway goes uphill to Gorlick's house and has some sharp curves. The truck had been backed up the driveway. According to Gorlick, backing a truck up the long, narrow driveway at night would not be easy to do.

Gorlick had left a light on inside the house, and when he pulled up to the house and got out of the car, he saw people moving around inside the house. Gorlick grabbed his cell phone, called the police, and walked to the bottom of the driveway to wait in the church parking lot for the police to arrive.

Within a few minutes, two officers from the Monroe Police Department arrived and met Gorlick in the church parking lot. After speaking with Gorlick, the officers drove up the driveway and parked behind Gorlick's car. When the officers got out of their car, they heard crashing noises and voices coming from inside the house. Through the large glass front window of the house, the officers saw three figures inside, each holding a flashlight. The officers saw at least two piles of items inside the house and determined that the crashing noises were the sounds of items being tossed onto the

2

piles. The officers were unable to identify any of the individuals they saw inside the house.

The officers called for additional units and stayed where they were in front of the house. Before the additional units arrived, the officers heard voices and saw flashlights coming from behind the house. The officers heard individuals running behind the house and chased after them.

The officers found Candy Mattila on her knees in bushes and Amanda Rockwell lying face down in blackberry bushes. The officers found Nicole Sand lying in the bushes nearby. Mattila, Rockwell, and Sand were handcuffed and taken into custody.

One of the officers searched Sand incident to arrest and found in his pocket titles and registrations to vehicles owned by Gorlick. Gorlick testified that he kept those documents in a cupboard in his kitchen.

In the area near where Mattila, Rockwell, and Sand were arrested, the officers found a backpack containing items belonging to Gorlick. A few days after the burglary, Gorlick found another one of his backpacks lying on his property filled with items that had been on a shelf inside his house.

The truck parked in Gorlick's driveway belonged to Sand and Mattila. In the back of the truck, the officers found boxes containing items belonging to Gorlick, such as Coca-Cola bottles, nails, tacks, a hummingbird feeder, an extension cord, jugs of ice melt, and other items. Some of the numbers on the license plate of the truck had been altered with duct tape to make them look like different numbers.

The officers discovered that the door jamb on the front door of Gorlick's house had been broken. A pile of material that Gorlick had stacked against the inside of the

3

front door to deter persons from entering his house when he was not there had been pushed aside.

Sand and Mattila were each charged with one count of residential burglary and tried jointly. The jury found Sand and Mattila guilty of residential burglary. Both Sand and Mattila moved for a new trial. The court denied the motion. Sand and Mattila appeal. Their appeals have been consolidated.

ANALYSIS

*Prosecutorial Misconduct*

Sand and Mattila argue that the prosecutor committed misconduct during rebuttal closing argument. The prosecutor's comments relate to a statement Mattila gave to the police.

The police interviewed Mattila at the Monroe police station. Mattila agreed to write a statement and asked Officer Block to write the statement for her. Mattila signed the statement in the incorrect place so that her signature did not indicate that, under penalty of perjury, the statement was hers. Officer Block handed the statement back to Mattila and showed her where to sign it. Mattila took the statement and marked through two lines, saying that she did not want "to get in trouble."[1] Officer Block took the statement away from Mattila and left the room.

At a CrR 3.5 hearing, the court ruled that Mattila's written statement to Officer Block was inadmissible, reasoning that "you cannot put that written statement in as her adopted statement when you ripped it out of her hand while she was changing it."[2]

---

[1] Report of Proceedings (RP) (Feb. 19, 2015) at 110.

[2] Id. at 155.

4

At trial, Mattila testified that she crossed statements out of her written statement because they were not true. On cross-examination, Mattila testified:

> Q. Isn't it true that you told Officer Block that Nicole Sand was in the house?
>
> A. No, I didn't.
>
> Q. Isn't it true that that was in the statement you signed prior to you crossing that portion out?
>
> A. I don't recall exactly what was in the statement, but I think I know that the statement was not my words, and that's why I was trying to cross things off that weren't true. He also wrote that I had three drinks, and I didn't say that either.
>
> Q. Things that weren't true. Isn't it true that you told the officer that you didn't want to get in trouble?
>
> A. Yeah. I thought he was mad at me.
>
> Q. Isn't it true that at that point you also did not want to get your boyfriend, Mr. Sand, in trouble?
>
> A. Why would I get him in trouble?
>
> Q. Didn't you indicate in your oral statement to Officer Block that Nicole Sand and Amanda Rockwell were in the house but you were not?
>
> A. No, I didn't.
>
> Q. Isn't it true that you became worried that, by pointing out that Mr. Sand was in the house, he could get in trouble and that's why you were striking through that portion of your statement?
>
> A. No. You're doing exactly what they did.
>
> Q. So your testimony is that the police officers were trying to get you to say what they wanted you to say, correct?
>
> A. It felt like it.
>
> Q. It felt like it. And yet isn't it true that you signed that statement without even bothering to read it?

5

A. Yeah, He told me to initial it, and then I was going to be allowed to read it and cross things off that weren't true.[3]

During rebuttal closing argument, the prosecutor stated:

But you heard—what was the part of Ms. Mattila's statement that she crossed through? It was the part about saying that Nicole and Amanda were in the house. Why cross out that section? That's the common thread between both her and Ms. Rockwell.[4]

Sand's counsel did not object to the prosecutor's comments. But immediately after the jury retired, Sand's counsel put on the record an objection to the prosecutor's comments as being in violation of the court's previous order excluding the written statement from evidence. Counsel explained that he did not object at the time the prosecutor made the statements because he "felt like the bell had been rung" and that an objection would only highlight the testimony.[5] Sand's counsel moved for a mistrial, and Mattila's counsel joined in the motion.

The court assumed, for purposes of the motion for a mistrial that the prosecutor referred to facts that were not in evidence.[6] But the court denied the motion, stating that any error could have been cured with an objection and an instruction to the jury to disregard the prosecutor's comment.

On appeal, Sand and Mattila argue that the prosecutor's comment constituted misconduct requiring reversal. We review allegations of prosecutorial misconduct for

---

[3] RP (Mar. 5, 2015) at 87-88.

[4] RP (Mar. 6, 2015) at 37.

[5] Id. at 44.

[6] The court did not, as Sand contends, specifically find that the prosecutor referred to facts not in evidence.

abuse of discretion.[7] The inquiry is twofold: (1) were the prosecutor's comments improper; and (2) if so, did the improper comments cause prejudice.[8] Where defense counsel moves for a mistrial due to prosecutorial misconduct directly following the prosecutor's rebuttal closing argument, the issue is preserved for appellate review.[9]

We assume, as did the trial court, that the prosecutor referred to facts not in evidence. The next inquiry is whether the prosecutor's comments were prejudicial. To show prejudice, Sand and Mattila must show a substantial likelihood that the prosecutor's comments affected the jury's verdict.[10] "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury."[11]

We conclude that Sand and Mattila failed to show prejudice from the prosecutor's comments. Sand argues that the comment was prejudicial because it suggested that he entered Gorlick's house. But the State presented ample evidence from which the jury could reasonably conclude that Sand entered Gorlick's house. The police officers who responded to Gorlick's 911 call testified that they saw three people inside the house with flashlights and then saw three people fleeing out the back of the house. The officers found Sand lying in bushes outside Gorlick's house. In Sand's possession when the officers found him were titles and registrations to vehicles belonging to Gorlick. Gorlick testified that he kept these documents inside his house. Given this

---

[7] State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014).

[8] Id.

[9] Id. at 430-31.

[10] Id. at 440.

[11] State v. Emery, 174 Wn.2d 741, 764 n.14, 278 P.3d 653 (2012).

evidence, it is not substantially likely that the prosecutor's comments affected the jury's verdict as to Sand.

Mattila argues that the prosecutor's comments prejudiced her because, given that she and Sand were dating, Sand's presence in Gorlick's house made it more likely that Mattila was acting as an accomplice to the burglary. She also argues that the prosecutor's comments invited the jury to speculate about the contents of the statement she gave to the police. But Mattila does not establish a substantial probability that the prosecutor's comments affected the jury's verdict. The responding officers' testified that Mattila admitted she stepped inside Gorlick's house during the burglary. There was compelling evidence that she acted as an accomplice.

### Error in Rockwell's Plea Agreement

Rockwell was charged with one count of residential burglary. She pleaded guilty to the charge and testified at Sand's and Mattila's trial on behalf of the State. In the plea agreement, the State agreed not to file additional charges of theft arising out of the incident at Gorlick's house in return for an agreement to pay restitution. The plea agreement identifies this incident as having occurred on December 20, 2013.[12] The burglary with which Mattila and Sand were charged occurred on December 29, 2013.

During cross-examination of Rockwell, Mattila's counsel questioned Rockwell about the provision in the plea agreement referring to an incident at Gorlick's house on December 20, 2013. Shortly after these questions, court adjourned for the day. Cross-

---

[12] The agreement states, "The State agrees not to file additional charges of theft arising out of Monroe PD 1303028 occurring on December 20, 2013 involving the victim for 1303028 listed in paragraph 8 above in return for an agreement to pay restitution for the same." Paragraph 8 of the plea agreement identifies Gorlick as the victim of "Monroe PD 1303028." Mattila Ex. 53.

examination of Rockwell resumed the following day. Sand's counsel asked Rockwell whether she was aware that one of the charges the State agreed not to file against her arose out of a theft on December 20, 2013 of which Gorlick was the victim. Rockwell said she was not aware of this. Sand's counsel then stated, "But here we are in the plea paperwork you just read yesterday that you're owing restitution for the crimes that you committed against Mr. Gorlick just nine days before this incident."[13] Rockwell again denied ever hearing anything about a theft on December 20, 2013 involving Gorlick as the victim. On redirect examination, the prosecutor asked Rockwell if it was possible that the plea agreement contained a typographical error and that the correct date should be December 29, 2013 rather than December 20, 2013. Rockwell agreed that it was possible that the date of the incident had been mistyped and testified that, to her knowledge, the Monroe Police Department did not investigate her in connection with an incident that occurred on December 20, 2013.

Out of the presence of the jury, Mattila's counsel argued that the prosecutor's failure to clear up the error at the beginning of Rockwell's cross-examination made defense counsel "look like a liar" who did not know the evidence and caused her to lose credibility with the jury.[14] Counsel also informed the court that the State did not turn over the plea agreement until the first day of trial, when counsel requested it.

Both Sand and Mattila moved for a mistrial. The prosecutor told the court that he realized the plea agreement contained an error during defense counsel's cross-examination of Rockwell the previous afternoon, but chose to wait until redirect

---

[13] RP (Mar. 4, 2015) at 36.

[14] Id. at 52, 64.

9

examination to clarify things, rather than say something immediately:

And by that time, the damage had already been done, because there was the implication being made in cross-examination that Ms. Rockwell was being dishonest about whether she knew Mr. Gorlick and whether she had been to that property before because of the plea agreement referencing a December 20th, 2013, theft.[15]

The trial court denied the motion for a mistrial. The court rejected the argument that the State violated CrR 4.7 by failing to turn over information. The court stated that the problem arose because the State interpreted the information in the plea agreement one way (December 20, 2013 was the incorrect date) and defense counsel interpreted it another way (December 20, 2013 was the correct date). The court noted that the State turned over 136 pages of discovery, many of which identified the burglary as having occurred on December 29, 2013. The court decided that, rather than resulting in a loss of defense counsel's credibility, the typographical error more likely made the State appear sloppy in the eyes of the jury and cast doubt on the State's case.[16] The court also stated that it was "clear and obvious" that Mattila was receiving a fair trial and invited defense counsel to bring to the court's attention any change in the juror's attentiveness to defense counsel's presentation of evidence.[17]

In its ruling denying the motion for a mistrial, the court also ruled that the prosecutor was permitted to present evidence that the plea agreement related only to the incident involving Gorlick that occurred on December 29, 2013 and not to anything that might have occurred on December 20, 2013. The State elicited testimony from a

---

[15] Id. at 56, 61.

[16] The court stated, "I think it is going much too far to say that the jury will not listen to what you say merely because you uncovered a typographical error that deserved to be uncovered." Id. at 75.

[17] Id. at 77.

Monroe police officer who responded to Gorlick's 911 call that the investigation under the case number listed in the plea agreement related only to the events of December 29, 2013 and no other dates.

Mattila argues that the trial court abused its discretion by denying her motion for a mistrial in connection Rockwell's plea agreement. She argues that the State violated its discovery obligations under CrR 4.7(a) by not timely turning over the plea agreement and by not disclosing that Rockwell's plea agreement contained a typographical error immediately after defense counsel questioned Rockwell about it on cross-examination.

A defendant is not entitled to a mistrial in every instance where the State has violated a discovery rule. Rather, where the State violates a discovery rule, a mistrial is appropriate "only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly."[18]

We review a trial court's decision to deny a motion for a mistrial for abuse of discretion.[19] A trial court abuses its discretion only if its decision is manifestly unreasonable, or based on untenable grounds or for untenable reasons.[20]

"'[T]he trial judge is in the best position to judge the prejudice of a statement.'"[21] We agree with the trial judge in this case that the State's late disclosure of the plea agreement and its failure to disclose the typographical error immediately after defense

---

[18] State v. Johnson, 124 Wn.2d 57, 76, 873 P.2d 514 (1994).

[19] State v. Wade, 186 Wn. App. 749, 773, 346 P.3d 838, review denied, 184 Wn.2d 1004 (2015).

[20] In re Det. of G.V., 124 Wn.2d 288, 295, 877 P.2d 680 (1994) (quoting In re Schuoler, 106 Wn.2d 500, 512, 723 P.2d 1103 (1986)).

[21] State v. Greiff, 141 Wn.2d 910, 921, 10 P.3d 390 (2000) (quoting State v. Weber, 99 Wn.2d 158, 166, 10 P.3d 390 (2000)).

counsel questioned Rockwell about the December 20 incident was not significantly prejudicial to Mattila's counsel. As the trial court noted, disclosure of the error likely made the State appear sloppy and could have raised a doubt in the minds of the jurors as to the merits of the State's case. On this record, we cannot say that denial of a mistrial was manifestly unreasonable, or based on untenable grounds or untenable reasons. We find no abuse of discretion in the court's denial of Mattila's motion for a mistrial.[22]

### Use of a Motor Vehicle

The trial court found that Mattila and Sand used a motor vehicle in the commission of the residential burglary. A court may instruct the Department of Licensing to revoke a defendant's license for one year upon conviction of a "felony in the commission of which a motor vehicle is used."[23]

Sand and Mattila argue that the court erred in finding that they used a motor vehicle because the truck was used only to transport them to the scene of the crime and was not used to store or conceal items stolen from Gorlick's house. We review the application of a statute to a specific set of facts de novo.[24]

The statute does not define the term "use." "In order for RCW 46.20.285(4) to apply, the vehicle must contribute in some way to the accomplishment of the crime."[25]

---

[22] Because we find no error with regard to the error in the plea agreement and the prosecutor's comments during rebuttal closing argument, we need not address Mattila's argument that she was denied a fair trial because of repetitive prosecutorial misconduct.

[23] RCW 46.20.285(4).

[24] State v. Dupuis, 168 Wn. App. 672, 674, 278 P.3d 683 (2012).

[25] State v. Alcantar-Maldonado, 184 Wn. App. 215, 227-28, 340 P.3d 859 (2014) (citing State v. Batten, 140 Wn.2d 362, 365, 997 P.2d 350 (2000)).

A relationship must exist between the vehicle and the commission or accomplishment of the crime.[26] A vehicle is not used in the commission of a crime where the vehicle was incidental to the commission of the crime.[27]

In State v. Batten, the defendant was convicted of unlawful possession of a firearm and possession of a controlled substance.[28] The firearm was found under the driver's seat of the car and the drugs were found in the console between the two front seats. The trial court found that the defendant's storage and transportation of the firearm and the drugs in his vehicle constituted "use" of the motor vehicle in the commission of the felonies of which he was convicted. Our Supreme Court affirmed the trial court's finding, concluding that there was a sufficient nexus between the defendant's possession of the firearm and the drugs and the use of the motor vehicle to justify the revocation of his license.[29]

In reaching its holding, the court in Batten discussed a California case in which the court applied that state's almost identical statute.[30] In that case, the California court concluded that the defendant who stashed a stolen tape deck in the trunk of an accomplice's car used the car in the commission of a felony. The court held that "'use of the vehicle to conceal the fruits of the crime in the trunk' and as transportation to and from the crime scene constituted a 'sufficiently strong nexus between the vehicle use

---

[26] Alcantar-Maldonado, 184 Wn. App. at 228 (citing Batten, 140 Wn.2d at 365).

[27] Id.

[28] 140 Wn.2d 362, 997 P.2d 350 (2000).

[29] Id. at 365-66.

[30] Id. at 366 (discussing In re Gaspar D., 22 Cal. App. 4th 166, 27 Cal. Rptr. 2d 152 (1994)).

and the crime' to apply California's license revocation statute."[31] The court in a case relied on by the California court held that defendants "used" a motor vehicle in the commission of grand theft where the defendants loaded heavy merchandise purchased with stolen checks on a U-Haul truck. The court concluded that use of the truck "was necessary in order to haul away the merchandise acquired in the fraudulent purchases."[32]

Here, the truck parked in Gorlick's driveway was loaded with boxes of items taken from his house. The items included Coca-Cola bottles, nails, tacks, a hummingbird feeder, an extension cord, and jugs of ice melt. Use of the truck was necessary in order to haul away the items taken from Gorlick's house. We find a sufficient nexus between the truck and the commission of the crime such that the truck was "used" in the commission of the crime. The trial court did not err in finding that Sand and Mattila used a vehicle in the commission of the crimes of which they were convicted.

*Community Custody*

The court sentenced Mattila as a first-time offender. The court sentenced her to 45 days of confinement with the possibility of work release, imposed 12 months of community custody, and ordered her to participate in a chemical dependency evaluation and to comply with all recommended treatment.

Mattila argues that the trial court erred by imposing a community custody term that exceeded the statutory maximum for first-time offenders. In sentencing a first-time

---

[31] Id. (quoting Gaspar D., 27 Cal. Rptr. 2d at 154).

[32] People v. Paulsen, 217 Cal. App. 3d 1420, 1423, 267 Cal. Rptr. 122 (1989).

offender, "[t]he court may impose up to six months of community custody unless treatment is ordered, in which case the period of community custody may include up to the period of treatment, but shall not exceed one year."[33] The State concedes that the trial court erred in imposing 12 months of community custody and agrees that the appropriate remedy is a remand for resentencing.

### Costs on Appeal

Both Mattila and Sand argue that if the State is the substantially prevailing party on appeal, we should not impose costs against them because they are indigent.

Appellate courts may require an adult offender convicted of an offense to pay appellate costs.[34] The commissioner or clerk will award costs to the State if the State is the substantially prevailing party on appeal, "unless the appellate court directs otherwise in its decision terminating review."[35]

A determination of a criminal defendant's indigency is entrusted to the trial judge whose finding of indigency we respect unless we are shown good cause not to do so.[36] Under the Rules of Appellate Procedure, where a party has been granted an order of indigency, the party and the party's counsel must bring to the attention of the trial court any significant improvement during review in the party's financial condition.[37] We "will give a party the benefits of an order of indigency throughout the review unless the trial

---

[33] RCW 9.94A.650(3).

[34] RCW 10.73.160(1).

[35] RAP 14.2.

[36] State v. Sinclair, 192 Wn. App. 380, 393, 367 P.3d 612 (2016).

[37] RAP 15.2(f).

court finds the party's financial condition has improved to the extent that the party is no longer indigent."[38]

The trial court issued an order finding Sand indigent and authorizing him to appeal in forma pauperis. The trial court has not found that Sand's financial condition has improved or is likely to improve. We therefore presume that Sand remains indigent.[39] Under these circumstances, we conclude that an award to the State of appellate costs in Sand's appeal is not appropriate.

Because of its concession of error regarding Mattila's sentence, the State does not seek costs in Mattila's appeal.

## CONCLUSION

We affirm Sand's judgment and sentence. We affirm Mattila's conviction, vacate her sentence, and remand for resentencing in accordance with this opinion. We do not award costs on appeal.

WE CONCUR:

---

[38] Id.

[39] Sinclair, 192 Wn. App. at 393; RAP 15.2(f).